UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ORLANDO SANCHEZ DE TAGLE,<br>　　　　　Plaintiff,<br>　　v.<br>SAN JOSE POLICE OFFICER JULIAN #4610,<br>　　　　　Defendant. | Case No.  23-cv-05095-VKD<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 46 |

In this action, plaintiff Orlando Sanchez de Tagle[1] asserts one claim against defendant Officer Zackery Julian of the San Jose Police Department for unlawful arrest in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983.  Dkt. No. 6.  Mr. de Tagle seeks $30 million dollars in compensatory damages and a permanent restraining order against Officer Julian.  *Id.*  All parties have consented to magistrate judge jurisdiction.  Dkt. Nos. 31, 33.

Officer Julian now moves for summary judgment on the ground that there is no genuine dispute of material fact and that the undisputed facts entitle him to judgment as a matter of law.  Dkt. No. 46.  He also asserts a defense of qualified immunity.  *Id.*  Mr. de Tagle filed a one-paragraph opposition to the motion, without any supporting evidence.  Dkt. No. 54.  The Court held a hearing on the motion on April 22, 2025.  Only Officer Julian's counsel appeared at the hearing; Mr. de Tagle did not appear.

Upon consideration of the moving and responding papers, and the oral argument presented, the Court grants Officer Julian's motion for summary judgment.

---

[1] Mr. de Tagle is representing himself in this action.

## I.   BACKGROUND

In support of his motion for summary judgment, Officer Julian relies on the following evidence: his own declaration and attached excerpts from police reports regarding the incident (Dkt. No. 46-1); testimony and exhibits from certain fact depositions (Dkt. No. 58); and video from Officer Julian's body worn camera (Dkt. No. 46-4). As noted above, Mr. de Tagle did not submit any evidence in opposition to the motion.

On April 6, 2023, at approximately 2:00 p.m., Officer Julian responded to a call at Willow Glen Elementary School regarding a "male suspect . . . who was there to pick up his son." Dkt. No. 46-1 ¶ 3 (Julian declaration). The dispatcher informed Officer Julian that the suspect, later identified as Mr. de Tagle, had recently lost custody of his children and that the children's mother was at the school to take custody of them. *Id.* ¶ 4.

Upon arriving at the school, Officer Julian obtained and reviewed a copy of the custody order issued by the Santa Clara County Superior Court on April 5, 2023 (*see* Dkt. No. 58 at ECF 46-47), and was told by the school resource officer that the resource officer had contacted the court clerk to confirm the order's validity. Dkt. No. 46-1 ¶ 5. The custody order stated in relevant part that Mr. de Tagle was to "turn over the children . . . to Mother today, April 5, 2023, at 5:00 p.m. at San Jose Fire Department, Station #6 . . . . Father is to have no contact with the children pending further order of the Court." Dkt. No. 58 at ECF 46-47. Officer Julian determined that the children's mother had been able to pick up her son from the school but that she had not picked up her daughter, and the daughter's whereabouts were unknown. Dkt. No. 46-1 at ECF 7.

Next, Officer Julian approached Mr. de Tagle in the school parking lot where he was speaking with another officer, Officer Philip Wagnon. *Id.* ¶ 6; *see also id.* at ECF 11. Mr. de Tagle informed Officer Julian that he was involved in an ongoing custody dispute with his children's mother but that he had received permission from Deputy District Attorney Giselle Espinoza to take his children. *Id.* ¶ 6; Dkt. No. 46-4 at 24:48-25:15 (Officer Julian's body worn camera video). Mr. de Tagle showed Officer Julian a "Good Cause report" dated March 10, 2023 (*see* Dkt. No. 58 at ECF 31). Dkt. No. 46-1 ¶ 6. The report stated in relevant part:

> With this document, the Santa Clara County District Attorney Child

2

United States District Court
Northern District of California

> Abduction Unit acknowledges the parent/guardian named on the reverse side of this card made a report to the office of the district attorney disclosing. . . . The reasons the child(ren) was/were taken, enticed away, kept, withheld, or concealed. A Good Cause report can only serve as a defense to an allegation of Penal Code Section 278.5 . . . The parent/guardian was informed that a Good Cause report does not guarantee a defense to child abduction/detention without further investigation.

Dkt. No. 58 at ECF 31. When Officer Julian explained that the April 5, 2023 court order had since transferred custody to the children's mother, Mr. de Tagle responded that the Good Cause report superseded the court's custody order and that he had been instructed by the District Attorney's office to show this report to law enforcement if a question arose regarding his custody rights. Dkt. No. 46-1 ¶ 7; Dkt. No. 46-4 at 28:57-29:14, 30:44-54, 31:28-39. He further asserted that he had just received a renewal of the Good Cause report that day.[2] *Id.* Officer Julian waited while Mr. de Tagle attempted (unsuccessfully) to call Deputy District Attorney Espinoza. Dkt. No. 46-4 at 33:40-34:04.

According to the body worn camera video, during the course of their discussion, Officer Julian asked Mr. de Tagle multiple times to disclose the location of his daughter, but Mr. de Tagle refused and periodically asserted that he was done answering questions or would not answer any more questions. *Id.* at 25:20-32; 25:45-26:12; 29:27-28; 30:34-44; 34:12-15; 36:10-15; 37:53-38:00.

Subsequently, the school resource officer joined Officer Julian, Officer Wagnon, and Mr. de Tagle in the parking lot. The school resource officer confronted Mr. de Tagle about the April 5, 2023 custody order, at which point Mr. de Tagle began to raise his voice and adopt a more aggressive tone. Dkt. No. 46-1 ¶ 8; Dkt. No. 46-4 at 35:11-36:07. The school resource officer and Mr. de Tagle continued to argue until the officers intervened, suggesting the argument was not productive. Dkt. No. 46-4 at 38:12-48.

As the body worn camera video shows, at around this time, Mr. de Tagle asked if he was

---

[2] Later during the encounter, Mr. de Tagle shared with the officers a recent email he had received from a deputy district attorney, *inviting* Mr. de Tagle to file a new Good Cause report. Dkt. No. 46-4 at 52:54-53:15.

3

being detained and arrested. *Id.* at 36:34-40. Officer Julian and Officer Wagnon acknowledged that Mr. de Tagle was being detained. *Id.* Mr. de Tagle then sat down on the ground, stating he had nothing further to say. *Id.* at 39:10-47. Officer Julian asked if there was a family attorney he could speak to, but Mr. de Tagle stated that he did not have an attorney. *Id.* at 39:47-40:00.

Officer Julian then stepped away from the conversation with Mr. de Tagle to speak by telephone with a woman identified only as "Teresa," a friend of the children's mother, who had accompanied the mother to the school. Dkt. No. 46-1 ¶ 9. Teresa told Officer Julian that Mr. de Tagle had emailed the mother's attorney a picture of himself in a military uniform holding a gun, accompanied by statements that the attorney and/or the mother would be "six feet under" and that Mr. de Tagle intended to take the children out of town. *Id.*; Dkt. No. 46-4 at 51:01-55. Teresa told Officer Julian that Mr. de Tagle owned guns and was capable of carrying out the threat. *Id.* Officer Julian states in his declaration that he "became concerned" after this call that Mr. de Tagle "may have violated California Penal Code § 422 by making criminal threats and, more importantly, that his daughter could be in imminent danger." Dkt. No. 46-1 ¶ 10.

After speaking with Teresa, Officer Julian returned to the parking lot where Mr. de Tagle remained with Officer Wagnon. At that point, Officer Julian and Officer Wagnon handcuffed Mr. de Tagle and escorted him to their police vehicle. *Id.* at 53:22-53:40. They searched Mr. de Tagle and removed his personal belongings before placing him in the back of the police vehicle. *Id.* at 54:27-55:33. The body worn camera video reflects that Mr. de Tagle had been speaking with the officers for about 30 minutes before he was handcuffed. *Id.* at 53:22-53:40. Mr. de Tagle again asked if he was being arrested; Officer Julian replied that he was still just being detained. *Id.*; Dkt. No. 46-1 ¶ 11.

Officer Julian asked again where Mr. de Tagle's daughter was. This time, Mr. de Tagle replied that she was at her grandfather's jewelry store. Dkt. No. 46-4 at 54:05-09; Dkt. No. 46-1 ¶ 12. Mr. de Tagle asked again if he was being arrested and Officer Julian explained that he was detaining him until he saw that Mr. de Tagle's daughter was safe. *Id.* at 55:22-25. Mr. de Tagle provided a telephone number for his father (his daughter's grandfather). Officer Julian called the telephone number in Mr. de Tagle's presence, and Mr. de Tagle spoke to the person who

4

answered. *Id.* at 59:49-1:01:47. Mr. de Tagle gave instructions, presumably to his father, to bring the daughter to the school. *Id.* Officer Julian then left the parking lot to speak with the children's mother, advising Officer Wagnon that he wished to get the mother's statement in order to have both sides of the story and to gather more information about the apparent threat Mr. de Tagle had made in his email to the mother's attorney. *Id.* at 1:02:36-1:03:04; 1:03:21-29. Officer Julian asked Officer Wagnon to take Mr. de Tagle's statement. *Id.* The video recording and police reports indicate that Officer Wagnon gave Mr. de Tagle a warning under *Miranda v. Arizona*, 384 U.S. 436 (1966) before taking his statement. *Id.* at 1:03:33-35; Dkt. No. 46-1 at 11.

Officer Julian took a statement from the children's mother. Dkt. No. 46-1 ¶ 14. In his declaration, he describes the email communications she showed him that Mr. de Tagle sent to her attorney, including the "one where he threatened to take the children and disappear, as well as an email titled 'Bang Bang' containing a picture of [Mr. de Tagle] holding a military rifle." *Id.* ¶ 15. Officer Julian also spoke to the mother's attorney "who provided additional context regarding the threats made by [Mr. de Tagle]." *Id.* ¶ 17.

At some point, Mr. de Tagle's father arrived at the school with Mr. de Tagle's daughter. *Id.* ¶ 19. Once both children were reunited with their mother and left the school, Officer Julian returned to the parking lot and released Mr. de Tagle. *Id.* ¶¶ 20-21. It appears from the body worn camera video that the entire encounter between Officer Julian, Officer Wagnon, and Mr. de Tagle lasted approximately one and a half hours, and that Mr. de Tagle was in handcuffs for approximately one hour of that time. Dkt. No. 46-1 ¶ 22; Dkt. No. 58 at ECF 14.

## II.   LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential

1    element of the nonmoving party's claim or defense or show that the nonmoving party does not
2    have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."
3    *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).
4    　　　　If the moving party meets its initial burden, the burden shifts to the non-moving party to
5    produce evidence supporting its claims or defenses. *See id*. at 1102. The non-moving party may
6    not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce
7    admissible evidence that shows there is a genuine issue of material fact for trial. *See id*. A
8    genuine dispute of fact is one that could reasonably be resolved in favor of either party. A dispute
9    is "material" only if it could affect the outcome of the suit under the governing law. *Anderson*,
10   477 U.S. at 248-49.
11   　　　　If the non-moving party fails to oppose, the Court must still consider whether the grant of
12   summary judgment is appropriate based on the record. A motion for summary judgment may not
13   be granted solely on the basis that the opponent did not contest the motion. *Heinemann v.*
14   *Satterberg*, 731 F.3d 914, 916 (9th Cir. 2013). However, the Court may take the unchallenged
15   facts as "undisputed for the purposes of the motion." Fed R. Civ. P. 56(e)(2).

## III. DISCUSSION

17   　　　　Officer Julian makes three arguments for summary judgment in his favor. First, he argues
18   that the undisputed facts establish that Mr. de Tagle was never arrested, but merely detained, and
19   that Officer Julian had reasonable suspicion sufficient to justify this detention. Dkt. No. 46 at 11-
20   16. Second, he argues that even if the detention could be considered an arrest, the undisputed facts
21   reflect that there was probable cause for the arrest. *Id.* at 16. Third, Officer Julian argues that,
22   even if the Court determines that there was no probable cause to arrest Mr. de Tagle, he is
23   nevertheless entitled to qualified immunity. *Id.* at 20. In response, Mr. de Tagle asserts only that
24   "there is no probable cause by Defendant to have unlawfully arrest[ed] plaintiff. All such claims
25   and or allegations against Plaintiff were false and malicious in nature." Dkt. No. 54 at 1. The
26   Court considers each asserted ground for summary judgment.

### A.　　Whether Mr. de Tagle Was Lawfully Detained

28   　　　　Officer Julian contends that his detention of Mr. de Tagle was not an arrest but an

1  "investigatory stop" under *Terry v. Ohio*, 392 U.S. 1 (1968).  "There is no bright-line rule to

2  determine when an investigatory stop becomes an arrest." *Washington v. Lambert*, 98 F.3d 1181,

3  1185 (9th Cir. 1996).  The Court liberally construes Mr. de Tagle's opposition as contending that

4  he was arrested, and not merely detained by Officer Julian.

5        In determining whether the police action constitutes a *Terry* stop (or detention) or an arrest,

6  courts "evaluat[e] not only how intrusive the stop was, but also whether the methods used were

7  reasonable *given the specific circumstances*." *Id.*  "Under ordinary circumstances, when the police

8  have only reasonable suspicion to make an investigatory stop, drawing weapons and using

9  handcuffs and other restraints will violate the Fourth Amendment." *Id.* at 1187.  However, "[t]he

10  whole point of an investigatory stop, as the name suggests, is to allow police to *investigate* . . . ."

11  *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002).  Thus, in some circumstances,

12  more "intrusive measures" may be needed, such as: "1) where the suspect is uncooperative or

13  takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police

14  have information that the suspect is currently armed; 3) where the stop closely follows a violent

15  crime; and 4) where the police have information that a crime that may involve violence is about to

16  occur." *Houston v. City of Fairfield*, No. 2:22-cv-01045-JAM-SCR, 2024 WL 4857649, at *5

17  (E.D. Cal. Nov. 21, 2024); *see also id.* at *6 (circumstances involving "individuals whose

18  uncooperative actions themselves disrupted and prolonged officers' investigations[] implicat[e]

19  the extraordinary circumstances that permit use of more intrusive measures under *Washington*").

20        The Court finds that there is no genuine dispute of material fact regarding the

21  circumstances of Mr. de Tagle's encounter with Officer Julian and Officer Wagnon, most of which

22  was captured by Officer Julian's body worn camera.  The record reflects that Mr. de Tagle was not

23  permitted to leave the school parking lot for approximately one and a half hours, and was

24  handcuffed for approximately one hour.  Initially, Officer Julian, with the assistance of Officer

25  Wagnon, conducted an extensive investigation into whether Mr. de Tagle may have been about to

26  commit, or had committed, a crime—specifically, a violation of California Penal Code § 278

prohibiting child abduction.³ During the course of that investigation, Officer Julian obtained new information suggesting that Mr. de Tagle may have committed another crime—specifically, a violation of Penal Code § 422, which prohibits threats of "death or great bodily harm" to another—and he proceeded to investigate that offense as well. During the investigation of these two offenses, Mr. de Tagle was not entirely cooperative. He initially refused to reveal the location of his daughter, despite Officer Julian's repeated requests for that information. *See* Dkt. No. 46-4 at 25:20-32; 34:12-15, 36:14-15. And while Mr. de Tagle provided some information to Officer Julian and Officer Wagnon regarding the circumstances he believed supported his right to take custody of his children despite the existence of the April 5, 2023 custody order, at other times he refused to answer the officers' questions. *See id.* at 25:45-26:12; 29:27-28; 30:34-44. Thus, Officer Julian's investigation of the offenses took longer than it might have had Mr. de Tagle been more forthcoming and cooperative.

As noted above, Officer Julian and Officer Wagnon did not merely prevent Mr. de Tagle from leaving the parking lot while they investigated the possible offenses at issue. After they had been speaking with him for approximately 30 minutes, the officers handcuffed Mr. de Tagle and placed him in the back of a police vehicle. Dkt. No. 46-4 at 53:27. In addition, before taking Mr. de Tagle's statement, Officer Wagnon gave him a *Miranda* warning. *Id.* at 1:03:33-35. Handcuffing a suspect and providing a *Miranda* warning are typical indicia of an arrest. *USA v. Ehrman*, No. 21-cr-00204-VC-1, 2022 WL 390716, at *1 (N.D. Cal. Feb. 9, 2022) ("Handcuffs are . . . 'a hallmark of a formal arrest.'") (quoting *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004)). However, both handcuffing and *Miranda* warnings may be necessary or advisable in some circumstances that fall short of an arrest. *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) ("A brief but complete restriction of liberty, if not excessive under the circumstances, is permissible during a *Terry* stop and does not necessarily convert the stop into an

---

³ The California Penal Code also contains a provision prohibiting the malicious deprivation of custody of a child from a lawful custodian. Cal. Penal Code § 278.5. It is not clear from Officer Julian's motion whether he is also asserting he had reasonable suspicion to investigate this crime. However, as discussed *infra*, the Court finds that the facts establish Officer Julian had reasonable suspicion to investigate at least two other crimes and thus need not reach this question for the purposes of summary judgment.

8

arrest"); *id.* at 1291 ("*Miranda* warnings are necessary even during a *Terry* stop if the suspect has been taken into custody or if the questioning otherwise takes place in a police-dominated or compelling atmosphere."). In any event, while the Court considers these circumstances in evaluating whether Mr. de Tagle was detained or arrested, neither is dispositive of that question. *See United States v. Kim*, 292 F.3d 969, 976 (9th Cir. 2002) ("But whether an individual detained during the execution of a search warrant has been unreasonably seized for Fourth Amendment purposes and whether that individual is "in custody" for *Miranda* purposes are two different issues."); *see also Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020) ("Handcuffing as a means of detaining an individual does not automatically escalate a stop into an arrest, but it 'substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop.'") (quoting *Bautista*, 684 F.2d at 1289).

Here, the record reflects that the officers handcuffed Mr. de Tagle only after Officer Julian learned that Mr. de Tagle had threatened the attorney representing the children's mother with harm and had threatened to take the children away; meanwhile, Mr. de Tagle had refused to reveal the location of his daughter. The officers handcuffed Mr. de Tagle in an effort to reasonably ensure Officer Julian could safely complete his investigation of the two offenses at issue. The record also reflects that Mr. de Tagle was given a *Miranda* warning only because Officer Wagnon wished to take his statement. This was a precaution meant to protect Mr. de Tagle's own constitutional right against compelled self-incrimination. Shortly after being handcuffed, Mr. de Tagle revealed the location of his daughter, contacted his father, and asked his father to bring his daughter to the school. Dkt. No. 46-4 at 59:49-1:01:47. Once the daughter was safely reunited with her mother, Officer Julian released Mr. de Tagle. Dkt. No. 46-1 ¶¶ 20-21. Mr. de Tagle does not contest this sequence of events nor provide any support for his contention that Officer Julian arrested him.

Construing the undisputed facts in the light most favorable to Mr. de Tagle, the Court concludes that the duration of Mr. de Tagle's detention was longer than most *Terry* stops, and some of the means used to restrict his movements were more intrusive than those typically used in a *Terry* stop. However, in view of the specific circumstances Officer Julian encountered in the course of investigating the offenses at issue, neither the duration of the detention nor the means

9

used to effectuate it exceeded what was reasonably necessary for completion of the investigation. The Court concludes that Mr. de Tagle was detained and was not arrested, and no reasonable jury could conclude otherwise.

Having determined that Mr. de Tagle was detained and not arrested, the Court must nevertheless consider whether, as a matter of law, the detention was lawful under the Fourth Amendment, i.e. whether Officer Julian had "reasonable suspicion" that Mr. de Tagle was committing or had committed a criminal offense. *Thomas v. Dillard*, 818 F.3d 864, 874-75 (9th Cir. 2016), *as amended* (May 5, 2016). In making this determination, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) (stating that "the totality of the circumstances—the whole picture—must be taken into account" when determining if an officer had reasonable suspicion to perform an investigatory stop).

Officer Julian argues that he had ample justification to detain Mr. de Tagle while investigating him for "potential child abduction and criminal threats under California Penal Code § 422." Dkt. No. 46 at 15. The elements of child abduction under Penal Code § 278 are: (1) the defendant maliciously took, kept, withheld, or concealed a child from his or her lawful custodian; (2) the child was under the age of 18; (3) when the defendant acted, he did not have a right to custody of that child; and (4) when the defendant acted, he intended to detain or conceal the child from the child's lawful custodian. *People v. Coulthard*, 90 Cal. App. 5th 743, 754 (2023), *reh'g denied* (Apr. 19, 2023), *review denied* (June 28, 2023) (citing CALCRIM No. 1250). The elements of Penal Code § 422, as recognized by the California Supreme Court, are:

> (1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat—which may be "made verbally, in writing, or by means of an electronic communication device"—was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the

10

person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.

*People v. Toledo*, 26 Cal. 4th 221, 227-28 (Cal. 2001) (citations omitted).

As to the crime of child abduction in violation of Penal Code § 278, the totality of the circumstances supports a finding that Officer Julian possessed reasonable suspicion that this crime was being committed. Officer Julian arrived at the school in response to a dispatch call that Mr. de Tagle was at the school to pick up his son over whom he no longer had legal custody. Dkt. No. 46-1 ¶¶ 3-4. Upon arrival, Officer Julian confirmed the validity of the custody order, which explicitly removed all Mr. de Tagle's custody rights as of one day prior. *Id.*; *see also* Dkt. No. 58 at ECF 46-47. Officer Julian additionally discovered that Mr. de Tagle's son had been reunited with his mother but that Mr. de Tagle's daughter was not at the school. Dkt. No. 46-1 at ECF 7. Officer Julian then spoke to Mr. de Tagle who admitted he was intentionally withholding his daughter from her mother and asserted he was given permission to do so by Deputy District Attorney Espinoza via a Good Cause report. Dkt. No. 46-1 ¶ 6; Dkt. No. 46-4 at 24:48-25:15. Even after Officer Julian explained to Mr. de Tagle that the superior court had issued a superseding custody order, Mr. de Tagle repeatedly refused to disclose the location of his daughter. *See* Dkt. No. 46-1 ¶ 7; Dkt. No. 46-4 at 25:20-32; 28:57-29:14; 30:44-50; 31:28-39; 34:12-15, 36:14-15. These circumstances more than establish a "particularized and objective basis" for Officer Julian's suspicion that Mr. de Tagle was committing a violation of Penal Code § 278.

The record similarly supports Officer Julian's reasonable suspicion that Mr. de Tagle had committed a violation of Penal Code § 422. During his investigation, Officer Julian received information that Mr. de Tagle had sent threatening communications to the attorney representing his children's mother. Dkt. No. 46-1 ¶ 9; Dkt. No. 46-4 at 51:01-55. He was informed that the communications included an image of Mr. de Tagle wearing a military uniform and carrying a gun, accompanied by statements that "they" (presumably the attorney and the children's mother)

11

would be "six feet under" while he took the children away.  Dkt. No. 46-4 at 51:01-55.  Officer Julian also received information that Mr. de Tagle owned a gun and was capable of carrying out his threat.  *Id.*  Thus, based on the information known to Officer Julian at this time, he reasonably suspected that Mr. de Tagle had intended to threaten the children's mother and/or her attorney with death or bodily harm in violation of Penal Code § 422 and thus lawfully continued to detain him while he further investigated the situation, including speaking to the children's mother and her attorney, and personally viewing the threatening communications.  These facts establish that Officer Julian possessed reasonable suspicion of a violation of Penal Code § 422.

Based on the undisputed facts, the Court concludes that Officer Julian had a reasonable suspicion that Mr. de Tagle was committing or had committed violations of Penal Code § 278 and Penal Code § 422, and grants Officer Julian's motion for summary judgment on this basis.

### B.     Whether Mr. de Tagle Was Lawfully Arrested

Officer Julian contends that, in any event, he had probable cause to arrest Mr. de Tagle for a violation of Penal Code § 166(a)(4), for disobeying a court order,[4] and Penal Code § 422, for threatening to cause bodily injury.  Dkt. No. 46 at 18.  The Court liberally construes Mr. de Tagle's opposition as contending that Officer Julian did not have probable cause to arrest him for any offense.

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested."  *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *see also Devenpeck*, 543 U.S. at 152 ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.").  "Probable cause is an objective

---

[4] The Court notes that the offenses for which Officer Julian claims he had probable cause overlap with, but are not the same as, those for which he claims he had reasonable suspicion.  However, this discrepancy does not impact the Court's determination, as the question before the Court is not which specific crime Officer Julian believed was at issue but whether he had probable cause to arrest Mr. de Tagle for *a* crime at the time of the arrest.  *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("[An officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.").

standard. The arresting officers' subjective intention . . . is immaterial in judging whether their actions were reasonable for Fourth Amendment purpose." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). Probable cause "is not a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014), and requires only "the kind of fair probability on which reasonable and prudent people, not legal technicians, act," *Florida v. Harris*, 568 U.S. 237, 244 (2013) (cleaned up). "[S]ummary judgment is appropriate when there is no genuine issue of fact and if no reasonable jury could find an absence of probable cause under the facts." *Johnson v. Barr*, 79 F.4th 996, 1003 (9th Cir. 2023) (quotations and citation omitted).

Penal Code § 166(a)(4) prohibits "[w]illful disobedience of the terms, as written, of a process or court order or out-of-state court order, lawfully issued by a court, including orders pending trial." Here, it is undisputed that at the time Officer Julian first encountered Mr. de Tagle he had information indicating that Mr. de Tagle was at his son's school with the intent to keep or take custody of both children in violation of a court order giving sole custody to the children's mother. While some courts have declined to find probable cause to arrest a parent for disobeying a custody order where the analysis would require interpretation of the order and thus California family law, *see Dowling v. Starr*, No. 3:19-cv-05777-WHO, 2021 WL 2865211, at *5 (N.D. Cal. July 8, 2021), there was nothing ambiguous about the April 5, 2023 custody order that Officer Julian considered. *See* Dkt. No. 58 at ECF 47 ("Father . . . is to turn over the children . . . to Mother today, April 5, 2023 at 5:00 p.m. . . . . Father is to have no contact with the children pending further order of the Court."). Indeed, in the first few minutes of his conversation with Officer Julian, Mr. de Tagle indicated that he was aware of the court order but intended not to comply with it because he believed that the Good Cause report he had obtained "superseded" the court's order. Dkt No. 46-4 at 28:57-29:14. Officer Julian has established that he had probable cause to believe Mr. de Tagle had committed or was committing a violation of Penal Code § 166(a)(4).

With respect to the alleged violation of Penal Code § 422, the elements of which are set out above, Officer Julian has also shown that he had probable cause to arrest Mr. de Tagle for this offense. As discussed above, Officer Julian had credible information, including his own

13

observations, indicating that Mr. de Tagle had sent communications threatening harm to another person (e.g., "six feet under").  In these circumstances, no reasonable jury could find that Officer Julian lacked probable cause to arrest Mr. de Tagle for a violation of Penal Code § 422 at that time.

Based on the undisputed facts, the Court concludes that Officer Julian had probable cause to arrest Mr. de Tagle for violations of Penal Code § 166(a)(4) and Penal Code § 422, and grants Officer Julian's motion for summary judgment on this basis.

### C. Qualified Immunity

Officer Julian's final argument for summary judgment in his favor is that even if the Court concludes that his arrest or detention of Mr. de Tagle was not lawful, he is nevertheless entitled to qualified immunity as a matter of law.  Dkt. No. 46 at 22-23.  Mr. de Tagle does not address this argument in his opposition.

"'Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73 (2017)).  "The two steps in the qualified immunity analysis are (1) 'whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right' and (2) 'whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.'" *Johnson*, 79 F.4th at 1004 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  In the context of a claim for unlawful arrest in violation of the Fourth Amendment, the Ninth Circuit has "summarized the two-step qualified immunity inquiry as '(1) whether there was probable cause for the arrest; and (2) whether it is reasonably arguable that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity.'" *Id.* at 1005 (quoting *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011)).  The "clearly established" prong of the qualified immunity analysis is a matter of law to be decided by the Court, once factual issues are resolved.  *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2017).  "The linchpin of the qualified immunity analysis is the reasonableness of the officer's conduct in the particular case at hand." *Rosenbaum*,

14

663 F.3d at 1078.

Here, Officer Julian was provided with, and personally reviewed, a copy of a custody order clearly stating that Mr. de Tagle did not have custody of his children and should have turned over both of his children to their mother the day before. *Dowling*, 2021 WL 2865211, at *6 ("[W]hen officers make an arrest based on an alleged violation of a court order, they have the obligation to familiarize themselves with the precise terms of the order before doing so."). While Mr. de Tagle disputed the effectiveness of the court order, he did not provide Officer Julian any "*countervailing* [court] order that would allow him to do what he had done" nor assert that such an order existed. *Id.* at *7 (emphasis added). Mr. de Tagle's Good Cause report states only that it "can only serve as a defense to an allegation of Penal Code Section 278.5" and that such "a defense to child abduction/detention" is not guaranteed "without further investigation." Dkt. No. 58 at ECF 31. Moreover, during the course of his investigation, Officer Julian was also provided information indicating that Mr. de Tagle had threatened to take his children away and had had sent threatening communications to the attorney representing his children's mother in their custody dispute. Dkt. No. 46-1 ¶¶ 9-10, 14-15.

There is no clearly established law identified by either party indicating that an arrest, let alone a detention, would be unlawful in these circumstances. And even if Officer Julian had made a mistake in enforcing the custody order, "the protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231 (citation omitted). Therefore, the Court finds that Officer Julian is entitled to qualified immunity and grants his motion for summary judgment on this basis as well.

## IV.     CONCLUSION

For the reasons set out above, the Court grants Officer Julian's motion for summary judgment. The Clerk shall enter judgment accordingly and close this file.

//

//

//

15

**IT IS SO ORDERED.**

Dated: June 30, 2025

Virginia K. DeMarchi
United States Magistrate Judge

16